The opinion of the Court was delivered by
Johnston, J. —
Edward W. Bancroft having deposited money in the State Bank, drew, in favor of these plaintiffs, severally, cheques for portions of his deposits ; and, payment being refused by the Bank, suits-were brought against it by the plaintiffs. The Circuit Court having decided against their right to recover, this Court is moved, by way of appeal, to reverse that judgment. The two appeals have been put on the same footing, and argued together, and are now to be decided by us.
The Court is not insensible to the unusual importance of the points involved; and, so far as its ability extends, has bestowed upon them a corresponding attention and consideration. *524 The question, whether a depositor’s cheque, drawn upon his-funds, actually in bank, entitles the holder, upon presentation, to maintain suit against the bank, has not hitherto been brought directly before our Courts ; nor are we aware of but one single decision upon it, either in this country or abroad. In the case of the National Bank vs. Eliot Bank, noticed in one of the law periodicals, (5 Amer. Law Register, 711), this question was decided in the negative ; but not without a dissent, entitled to much' respect; and, after mature reflection, our own persuasion' is, that a codtrary decision would have been better upheld by principle, and by sound commercial usage and policy.
In the best conducted banking institutions, the well recognized usage is this: when a customer deposits funds, the bank is understood to receive them with a tacit engagement to pay them out to his order, or cheque drawn in his own favor, or in favor of third persons, with whom he may have dealings. This is understood to be the bank’s duty and en gagement, incurred by the simple act of receiving the deposits as a consideration for its right to employ the money, and which it is to perform, upon the single condition of being notified of the existence of the cheque, in such manner as to free it. from danger of being made liable to pay the same amount twice- — -that is to say, the cheques take precedence according to the order of the notification.
In addition to the obligation arising from this mercantile usage, forming part of the law of the land, and of which Courts are bound to take notice, the charter of the defendant bank declares, that it “ shall receive money on deposit, and pay away the same to order, free of expensewhich direction must be construed in thp light of the' custom, or habit, and to mean, that the bank shall pay to the depositor’s order, not only when drawn in his own favor, but also when made payable to third persons.
Banks, by going into business, are understood to hold *525 themselves out us having undertaken, and assumed upon themselves to be- liable for, all that that business, in commercial usage, obliges them to do; and when they accept charters, their acceptance must be regarded as an undertaking to do what the charter commands ; so that we are here presented, in a single view, with the scope of this defendant’s. duty, both from custom and charter; and at the same time with its own promise to do it.
This bank may, therefore, be considered to have promised Bancroft, when it obtained the custody of his money, that it would honor his cheques by paying out the fund, either to himself or to other persons, as his cheques might direct. When a draft under these circumstances comes to the bank, it comes as its own contract, made by it on the consideration of having received funds as the means of its fulfilment; and, as between the bank and the holder of the cheque (when drawn to a third person) Bancroft is really the bank agent, empowered to give the order. The contract presented is the original personal promise of the bank, itself.
These dealings in bank cheques stand upon peculiar grounds. The exigencies of trade do not admit of the delays attending the process of acceptance, or arising from the efflux of days of grace. If these drafts are delayed; if the bank, being in funds, be at liberty to refuse payment, the inevitable consequence to the parties disappointed, can be none other than such as the want of scrupulous punctuality always inflicts. The drawer’s credit suffers; and it is well known that for this injury a depositor is entitled to his. action against the bank.
We do- not hear of a right of action on the part of the holder; but is not this very fact some incidental proof that his right is the money contained in the draft, and that his right of action is for the money, and not for special damages, for its non-payment?
But in contemplating the consequences of the bank’s vio *526 lation of its general duty, the disappointment of the holder is not to be overlooked, though no special action lie for it, and he be left, as in other cases, to an action for the debt due him.
The holder is certainly affected; the whole commercial community, and every interest dependent on commerce, (and thht is every interest in the civilized world,) is affected. These instruments pass daily from hand to hand, and perform good service in exchanges and settlements. The public confidence in them is of a twofold nature. It is, first, in the drawer. Is he of known character? One who habitually draws only upon real resources ? Is it based, again, upon the certainty of bank usage. Is it a fixed rule of trade, that when in possession of a drawer’s funds, the bank will, on no account, permit itself to withhold payment, if properly notified? These two things being fixed in the public mind, universal, undoubting confidence obtains.
As to the character of the depositor, men must judge of that for themselves. But as to the punctuality of banks, destroy it, and who shall calculate the consequences? It is for this reason that when their duty is ascertained, it is the duty of judicial tribunals to hold them to the exact and unvarying performance of it.
Now, having described the duty of the defendant bank, both under the lex mercatoria and under its charter, the question recurs, whether the plaintiffs, holding and presenting cheques drawn by the depositor on his funds actually in bank, were entitled to recover the money which the bank refused to pay.
It is hardly necessary to observe, that the money,- when the order was drawn, belonged, of strict right, to Bancroft, the depositor; and had he demanded it, to himself, the bank had no right to withhold it from him. It was his property^ and had he, on refusal to pay it to him, brought suit, it would *527 have been incompetent for the bank to set off demands not yet due, against his claim. This is plain and familiar law.
It is not intended to go beyond the case, and say, whether if at the time of the order, Bancroft’s debts had been due, they might have been set off or not, either against himself or the holder of his cheque. The case requires no such speculative decision. What I intend to assert is, that demands yet to mature, were no set off either against Bancroft or his assignee. In reference to notes discounted by him in bank, the dependence of the bank was not upon his deposites; it was under no necessity, and had no right, to count for its security upon the deposites. Its calculations should have been on the endorsements of his notes; and it should have taken care that this security was good.
To return from this digression. Instead of drawing in his own favor, this depositor drew in favor of the plaintiffs. That • is to say, he assigned to them such portion of the deposites as he deemed fit.
It is not perceived upon what principle the justice of the plaintiffs’ claim to the thing assigned can be disputed.
I do not understand, indeed, that it is its justice that is contested. Nor, strictly, is it their legal right to the fund which is denied. The thing disputed is its enforceability. The law is reproached with the doubt, whether its technical rules do not interpose obstacles to the remedy which the right seems to require.
It is supposed that there is a want of privity between the Bank and the holders of these cheques, which screens it from suit; that such privity is not established until the Bank, over and above all that it has done, shall have assumed payment to the holders.
I apprehend this is a misconception and an unnecessary disparagement of the law.
It "is enough if it appears that ex equo et bono, the plaintiffs are entitled, as between the parties to the suit,* and to the *528 instrument, to tbe money. If so, an action lies for money had and received to their use.
I have said that an action might have been brought by Bancroft, against the Bank, for the injury^ done his credit by refusing his cheque. And what does this prove but that (in a single breath) the refusal was wrong ? Wrong to the plaintiffs, wrong to Bancroft, wrong on the part of the Bank. An act which it was illegal to do: contrary to right. Can less be made of this, than that the plaintiffs were ex equo entitled to the money ?
I refer to a passage in Dunlop vs. Silver, (1 Cranch, 440,3, Appendix A.) too long to be brought out here, in which there is an enumeration of cases in which the action for money had and received applies: and among them cases of a fictitious payee of a bill of exchange, where it was conceded there was a want of privity, yet the plaintiffs recovered in this form of action: and actions against stakeholders on the determination of wagers, when there was no higher privity than exists in this case; and when Lord Holt observed, such was the mutability of the right, that the right to the money was altered by the cast of a die.
In these cases there are counts -for money had and received to the plaintiffs’ use. Had there been an omission to insert them, the declarations might have been amended.
But as it is unquestionable that on the money, counts the cheques might have been given in evidence: that, of itself, in my humble opinion, would have authorized a recovery on counts on the cheques themselves, had there been no others. For can it be vicious pleading to state, in a special way, the facts under cover of which you may recover on the general counts ?
I now proceed to consider the plaintiffs’ right to this money, under the form of contract which was adopted; relinquishing all advantages arising from the doctrine ex equo et b'ono. I think the Bank has made a contract, *529 which, regarded as its own contract, makes it liable to a legal recovery by the plaintiffs.
Wherever one, by his own engagement, (and I have shown what this of the Bank is,)-promises to pay to the order of another, the person in whose favor the order is made, may enforce the promise.
And in the case of Weston vs. Barker, (12 John. R. 276,) where Bowen and Bobbins made an assignment to Barker, to collect the funds, and, after paying speijified creditors, hold the residue subject to the order of the assignors: and it was held that Weston, to whom they ordered this balance to be paid, might maintain an action against Barker for it, as money received to his use. Mr. Justice Thompson said: “ It was not denied by defendant’s counsel, that the action would be supported, if an express promise to pay” (meaning an express promise to Weston, such as was contended was necessary to constitute a privity with him,) “was proved.” “It appears to me,” says he, “that the proof in this case, establishes such a promise, according to the good sense and sound interpretation of the rule.” The defendant “ expressly engaged to comply with the condition mentioned in the letter.” “The money has been, in fact, received by the defendant: and, according to the very terms of his engagement, was received as the money of the plaintiff, and not-as the money of Bowen and Bobbins, they having previously' directed the same to be paid to the plaintiff.”. “It was considered,” proceeds the judge, “in the argument, that had the plaintiff been named in the declaration of trust, as one of the persons to be paid, he could maintain this action. And where, in good sense and sound principle, can be the difference, whether he was originally named or subsequently designated according to the terms of the defendant’s undertaking? His express promise was to hold the balance subject to the order of Bowen & Bobbins. As soon as such order was given, this promise attached, and enured to the *530 benefit of tbe person named in such order.” And tbe learned Judge goes into an examination of cases and principles to sustain bis conclusion: for wbicb, I refer to bis argument.
This case, (Weston vs. Barker,) stands upon a principle, that, when fully understood and appreciated, is sufficient for tbe case before us; and it is tbis, that where one in consideration of money to come into bis bands, promises to disburse that money as be shall be ordered by him from whom be receives it, be thereby creates a contract, negotiable in its very nature, wbicb puts him in privity with whomsoever, in tbe world be may be ordered to make payment to, so that the promise is, according to tbe law merchant, made to that person, and be is bound by bis promise to pay him.
Tbis is a principle of inappreciable value; and when tbe » law, from its ruder stages has traveled up to it, it should never be suffered to lapse away, again, under tbe load of mere technicalities. These should be brushed away, where they cease to be helps,„ and become mere incumbrances. Tbe principle should be secured to society.
We have traces of tbe same principle in every day life ; daily administered in our Courts: yet, wonderful to say, not fully perceived. Tbe learned Judge who dissented in tbe National Bank vs. Eliot Bank, point sout some of them. Where a party offers a reward for lost or stolen goods, what obliges hipa to pay tbe restorer of bis property, but tbis very principle ? Should be turn round, and deny privity with him, because be did not prophetically name him before, or make an assumpsit to him after be ascertained him, would tbe Courts let him escape ? No! And yet tbe only difference, in principle, between bis case and that of Barker, is, that bis promise is founded upon tbe consideration of recovering bis own property, and Barker’s upon that of getting possession of tbe property of other persons. Both are to persons unascertained when the promise was made.
*531 Whenever a contract is essentially of a circulating nature, going about, as it were through society, to draw forth the exertions or the property of its members, as it may encounter them here and there, on the commercial arena, it carries its own consideration and its own obligation with it, and forms a privity with the persons to whom it comes.
Long before the Statute of Ann, as is shown in the instructive case of Dunlop vs. Silver, (1 Cranch, R. 367, Appendix A.,) the principle I have mentioned, the very principle of this case, was embedded, as the law merchant, in the laws of England; and was working its way through the noble chaos of the Common Law. Nothing but the sturdiness of Lord Holt, (a mere speck on that great character,) compelled the Parliament to put in a statutory form what was law before. 2 Shower, 161. (1 Cranch, 430, and cases there cited.)
It is’ believed to be incontrovertibly true, that he for whose benefit a promise is made, may maintain an action upon it, though no consideration (except in a commercial sense, as I have endeavored to explain it,) pass from him to the defendant ; nor any promise, from the defendant to him. That simple position fully supports, in principle, the present case.
Commercial' good, if not commercial necessity, seems to demand that cheques be regarded, as they are, in practice, intended to be; as transfers of the fund assigned: and not as mere powers to receive the money.
It is ordered that the nonsuit be set aside, and a new trial be granted.
Wabdlaw, J., concurred.